# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                 No.  CR-02-0409 MV

OSCAR FELIX CARRAZCO-ESCALANTE,

     Defendant.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Oscar Felix Carrazco-Escalante's Motion to Suppress **[Doc. No. 30]**, filed October 10, 2002.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is well taken and will be **GRANTED**.

### BACKGROUND

On November 17, 2001, from 3:00 p.m. to 11:00 p.m., United States Border Patrol Agent Jeffrey King was patrolling Highway 80, a two-lane highway which runs northeast from the New Mexico-Arizona border and intersects with Interstate-10 at Road Forks.  At the motion hearing, Agent King described Highway 80 as "an alien and drug smuggling route."  Near the end of his shift, while he was observing traffic from the side of Highway 80 at the Cienega Ranch turn off, Agent King noticed a dark Chevy pickup truck with Arizona license plates traveling north toward Interstate-10.  Agent King testified that a vehicle with Arizona license plates in that area at that time of night was unusual, and that, in his experience, vehicles traveling north on Highway 80 carrying illegal aliens or narcotics typically have Arizona license plates.

Agent King decided to follow the pickup truck.  As he was driving behind the truck, Agent King observed that the truck was veering from one side of the lane to the other.  Agent King testified that the driver's behavior led him to believe that the driver was watching Agent King in his mirrors, demonstrating concern that a border patrol agent was following him.  Agent King followed the truck up to a truck stop at Road Forks.  The truck stop is approximately fifty yards from Interstate-10 and eighteen miles from Lordsburg, the nearest town.

According to Agent King, as he approached the truck stop, the lights from the truck stop illuminated the inside of the cab of the truck he was following and Agent King observed what he believed to be stacked up bundles of marijuana.  At that point, Agent King activated the emergency equipment on his vehicle.  The truck then drove into the truck stop but instead of stopping at the truck stop, kept going.  The truck finally stopped approximately fifteen feet past the truck stop.  As soon as the truck stopped, the driver and the passenger opened their doors, exited the truck and ran away in different directions, the driver running south behind the truck stop and the passenger running north towards Interstate-10.  Agent King approached the truck, where he observed bundles of what appeared to be marijuana in both the cab and the bed of the truck.  He began to secure the bundles and radioed his office for assistance.

Approximately ten minutes later, Border Patrol Agent Eddie Parra arrived at the scene.  Agent King and Agent Parra began looking for foot sign around the vehicle in an effort to track the individuals who had fled from the truck. While they were searching the ground around the truck, an individual later identified as Defendant appeared on the other side of the road.  According to Agent King and Agent Parra, there was nothing on the other side of the road except an abandoned motel and a closed gas station, neither of which had any lights and were surrounded by mesquite brush.

Defendant crossed the road and walked toward the truck.  Both Agent King and Agent Parra testified that Defendant's clothing was covered in grass and dirt and that it appeared as if he had just walked out of the brush.

According to Agent King and Agent Parra, Defendant approached the agents and asked if there was a bathroom inside the truck stop.  Agent Parra testified that he told Defendant that there was a bathroom in the truck stop, introduced himself as a border patrol agent and asked Defendant whether he was a United States citizen and that Defendant replied that he was not a citizen.  Agent Parra further testified that he then asked Defendant where he was born and whether he had any immigration documents and that Defendant told him that he was born in Mexico.  According to Agent Parra, Defendant handed him his resident alien card and Agent Parra confirmed that the photograph on the card was Defendant's and then returned the card to him.

According to Agent Parra, he then asked Defendant if he would talk to the agents further, and that Defendant said that he needed to make a telephone call.  Agent Parra testified that Defendant asked if he could go into the truck stop and make his call first and that Agent Parra replied, "Okay. Do you mind if I walk in the store with you?"  According to Agent Parra, Defendant said, "Sure," and they walked into the restaurant at the truck stop together.  Agent Parra testified that, inside the truck stop, Defendant used a public phone to call his wife in Tuscon to make arrangements for her to pick him up.  According to Agent Parra, as Defendant was talking to his wife, he asked Agent Parra for driving directions from Tuscon to the truck stop, and then relayed those directions to his wife.  Also according to Agent Parra, after Defendant completed his telephone call, he again asked if Defendant was willing to talk, and Defendant said yes.  Agent Parra testified that at this point, he asked Defendant if he would go outside with him, and Defendant again said yes.  According to Agent

Parra, once they were outside, he began questioning Defendant about what he was doing in the area. Also according to Agent Parra, Defendant said that he was on his way to Tucson or Phoenix, that a friend of his, whose name he could not provide, had just dropped him off and that he was trying to get a room at the motel across the street.

According to Defendant's testimony, he crossed the road to the truck stop after trying unsuccessfully to find a room at the motel, which was closed. Defendant testified that he asked Agent King and Agent Parra where the entrance to the restaurant at the truck stop was and that they directed him to the entrance. According to Defendant, he entered the restaurant alone and asked the proprietor if he could use the telephone to call his wife so that he could ask her to come pick him up. Defendant testified that it was while he was on the telephone speaking to his wife that two law enforcement officers entered the restaurant, whom Defendant believed to be a border patrol officer and a sheriff. According to Defendant, the officers asked him if he would go outside with them and talk, and he responded, "No problem. Let me finish with my call." It was after he finished his call and they all went outside, Defendant testified, that the officers inquired about his citizenship and looked at his resident alien card. Defendant stated that his conversation with the officers was short, "not even ten minutes," but that the officers were "right in front of [him] real close, trying to intimidate [him], already accusing [him] that [he] was the driver of that truck," and that he was afraid and shaking.

According to Agent Parra's testimony, while he was questioning Defendant outside, Deputy David Arredondo and Deputy Marcos Mendez from the Hidalgo County Sheriff's Department arrived at the scene. Agent Parra testified that he informed Deputy Arredondo that he smelled alcohol and

marijuana on Defendant and turned Defendant over to Deputy Arredondo for further questioning and testing.[1]

Deputy Arredondo testified that he approached Defendant with the intent of questioning him in order to determine whether he was intoxicated to a point that he would need to be "detoxed," a procedure authorized by state law whereby, although no charges are filed, the police take an individual into custody and place him in a jail cell until he is no longer intoxicated. Deputy Arredondo further testified that he smelled the odor of alcohol and burnt marijuana on Defendant. According to Deputy Arredondo, he had a brief conversation with Defendant during which Defendant told him that he had "a beer or two" and had "smoked a joint." Also according to Deputy Arredondo, Defendant asked him what was going on and when Deputy Arredondo told him that the border patrol agents had stopped the truck because it was loaded with marijuana, Defendant appeared surprised.

---

[1]Both Agent King and Agent Parra testified that, at this point, they returned to the truck and together searched the ground around the truck for foot sign. There is a discrepancy in the evidence regarding what the agents found. Agent King testified that although the area immediately around the truck was a paved or hard gravel area, he and Agent Parra found footprints on the ground farther away from the truck that matched the bottom of Defendant's shoes. In his written report of the investigation, however, Agent King did not state that Defendant's shoe print matched any footprints found on the ground in the area of the truck. When asked how they determined that Defendant's shoe print matched the footprints found on the ground, Agent King testified that as Defendant was walking, they looked to see what kind of sign he was leaving on the ground. According to Agent King, neither he nor any of the other officers took off Defendant's shoes or took any measurements of Defendant's shoes or the footprints on the ground. Agent King admitted that his determination that Defendant's shoes matched the footprints in the area was actually "an estimate." In contrast to Agent King's testimony, Agent Parra testified that they did not find any tracks leading away from the truck, as the ground was "hard ground, gravel, paved." Agent Parra testified that they found no footprints at all. Similarly, Agent Garnsey testified that he, too, searched for footprints leading away from the truck and that he did not see any prints in the area. The government's response papers make no mention of any discovery of footprints in the area, or of any match between Defendant's shoes and foot sign in the area. Because Agent King's testimony regarding the discovery of matching footprints is unsupported by and in fact conflicts with the other evidence in the record, the Court finds that this testimony is not credible.

According to Deputy Arredondo, while he was questioning Defendant, Border Patrol Agent Brian Garnsey, a certified canine handler, arrived at the scene with his dog.  Agent Garnsey testified that his dog is trained to detect the odors of cocaine, marijuana and methamphetamine.  There is conflicting evidence regarding what happened next, and no photographs or videotapes were taken. At the hearing, Agent Garnsey testified that he asked Defendant whether he would mind if Agent Garnsey put Defendant's jacket into a clothing line-up and that Defendant agreed to give Agent Garnsey his jacket.  Agent Garnsey's written report of the incident, however, does not state that Defendant consented to give Agent Garnsey his jacket and have it sniffed by the dog.  Moreover, in its response to Defendant's motion, the government states that Agent Garnsey "cannot recall if the Defendant consented to the inspection."  Government's Response at 5.  Deputy Arredondo testified that he saw Defendant take off his jacket and hand it to Agent Garnsey but that he did not hear anyone ask him to remove his jacket.   Defendant testified that an officer said, "I need to have your jacket," and then grabbed his jacket from him and threw it on the floor.  According to Defendant, the officer never asked for the jacket and Defendant never told the officer that he could take the jacket. Rather, Defendant testified that because the officer said he needed the jacket, he felt like he had "better do it," and when the officer grabbed it, he "just let it go" and did not fight.

Agent Garnsey testified that he placed Defendant's jacket along with two of the other agents' jackets in a line on the ground.  Agent Garnsey then did a canine sniff of the jackets and the dog alerted to Defendant's jacket only.  At that point, Agent Garnsey picked up the jacket,  searched it and found a cellular telephone inside the jacket.  According to Agent Garnsey, he and the other agents went over to the truck and attempted to put the cell phone into the jack in the truck to see if it would fit.  At the hearing, Agent Garnsey could not recall whether it was he or one of the other agents who

actually put the cell phone into the jack in the truck.  He, however, testified that Defendant's cell phone fit into the jack.  Agent Garnsey also testified that Defendant's cell phone was not unusual, but that it had a connection for a jack that was different from the connection on all three of the cell phones that Agent Garnsey himself had owned.

Agent Garnsey further testified that he found a loose piece of plastic on the floor inside the truck, which had a footprint on it.  According to Agent Garnsey, he looked at the bottom of Defendant's shoe and determined that the footprint on the plastic matched the pattern on the bottom of Defendant's shoe.  In contrast, Defendant testified that the agents looked at the bottom of his shoes, but that he heard them say that the shoe "did not match with the one [they were] trying to get."  Agent Garnsey was not able to identify what the piece of plastic was or what function, if any, it played in the truck.  Agent Garnsey testified that no tests were run on or measurements taken of either the piece of plastic or Defendant's shoe.  Further, Agent Garnsey testified that none of the law enforcement officers took off Defendant's shoe to compare it to the piece of plastic.  Defendant confirmed that he never removed his shoes.  At the hearing, neither the piece of plastic nor Defendant's shoes were produced as evidence.  Photographs of the piece of plastic and photographs of the sole of Defendant's shoe were introduced and the Court reviewed the photographs.

After the agents found that the cell phone fit the charger in the truck, Deputy Arredondo placed Defendant in handcuffs.  According to Deputy Arredondo, Defendant began making incriminating statements to the effect that he "did it for his family."  It is unclear from Deputy Arredondo's testimony whether those statements were made before or after Defendant was placed

in handcuffs and what precisely was the substance of those statements.[2]  Deputy Arredondo testified

that he told Defendant to be quiet and called Agent Parra over.

According to Agent Parra, Deputy Arredondo called him over and told him that Defendant

wanted to admit and wanted to talk to him only.  Agent Parra testified that he then approached

Defendant, who told him that he would tell him everything that had happened.  Agent Parra testified

that he took Defendant over to his patrol car and read Defendant his *Miranda* rights and that

Defendant then made his admission.  Defendant testified that, at this point, he admitted to being the

driver of the truck.

Defendant was charged with possession with intent to distribute 100 kilograms and more of

marijuana.  On October 10, 2002, Defendant filed the instant motion to suppress.  Defendant seeks

to suppress all of the evidence obtained by the government through the search of Defendant's person,

the canine sniff and Defendant's subsequent arrest, which evidence includes the cell phone found in

Defendant's jacket, the piece of plastic found in the truck and the statement which Defendant made

after he was placed in handcuffs by Deputy Arredondo and read his *Miranda* rights by Agent Parra.

The government filed its response in opposition on November 4, 2002.  The Court held an evidentiary

---

[2]  There is no other evidence or testimony about statements made by Defendant to Deputy
Arredondo.  The government's response papers do not mention any such statements.  Moreover, the
government's papers state that Defendant admitted that he was the driver of the load vehicle only
after he was advised of *Miranda* rights.  Consistent with the government's papers, Agent Parra
testified that he was not given any information from any of the other law enforcement officers before
he spoke with Defendant about what Defendant may have told them or what they discovered in their
investigation up to that point.  In addition, while Defendant testified that it was the sheriff who placed
him in handcuffs, he testified that he gave a post-arrest statement to one of the border patrol agents.
Given the vague nature of Deputy Arredondo's testimony along with the fact that there is no other
evidence that Defendant made incriminating statements to him, the Court finds that this portion of
Deputy Arredondo's testimony is not credible.

hearing on January 14, 2003. At the completion of the hearing, the Court took the motion under advisement.

## DISCUSSION

Defendant does not contest as unreasonable either the initial stop of the truck or the initial questioning of Defendant. Rather, Defendant asserts that the search of Defendant's jacket was unlawful, as it went beyond the scope of a search incident to an investigative detention and was conducted without Defendant's consent. Moreover, Defendant argues, even if the search had been conducted legally, the evidence discovered through the search was insufficient to establish probable cause for Defendant's arrest. Accordingly, Defendant concludes, the evidence discovered through the search and arrest of Defendant must be suppressed.

I.    Dog Sniff and Seizure of Defendant's Jacket

Investigative detentions are "Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity." *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996). In *Terry v. Ohio*, the Supreme Court established that an investigative detention comports with the Fourth Amendment only if the officer's action "was justified at its inception . . . and was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. 1, 20 (1968). An investigative detention is justified at its inception where the officer has "an articulable and reasonable suspicion that the person detained is engaged in criminal activity." *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993). The officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citations omitted). Further, "reasonable suspicion must exist at all stages of the detention." *United States v. Soto-Cervantes*, 138 F.3d 1319,

1322 (10th Cir. 1998), *cert. denied*, 525 U.S. 853 (1998).  Once the concern that justifies an initial stop is dispelled, any further detention will violate the Fourth Amendment.  *See Id.*

In the course of a lawful investigative detention, an officer may conduct a limited protective search for weapons.  *See Davis*, 94 F.3d at 1468.  Specifically, an officer is authorized to conduct "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' that he is dealing with an armed and dangerous individual." *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (citation omitted).  The Supreme Court has defined the permissible boundaries of a pat-down search, which must be "strictly circumscribed by the exigencies which justify its initiation."  *Terry*, 392 U.S. at 26.  A pat-down search "is not [intended] to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citations omitted).  Consequently, such a protective search, permitted without a warrant and in the absence of probable cause, "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."  *Terry*, 392 U.S. at 26.

In the instant case, the government admits that, at the time Defendant's jacket was taken and subjected to the dog sniff, the officers had no more than a reasonable suspicion that Defendant was engaged in criminal activity.  Thus, in the context of their investigative detention of Defendant, the officers were permitted only to do a pat-down search of Defendant's clothing for weapons.  Rather than conduct such a pat-down search, the officers took Defendant's jacket, placed it in a clothing line-up and subjected it to a dog sniff.  This procedure went beyond what was necessary to determine whether Defendant was armed and was conducted for the sole purpose of discovering evidence of a crime.  The officers' actions thus exceeded the permissible boundaries of a *Terry* protective search.

-10-

The government argues that the dog sniff of Defendant's jacket nonetheless was legal as it did not constitute a search within the meaning of the Fourth Amendment. In support of this argument, the government relies on *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1994). In *Ludwig*, a border patrol agent walked a trained narcotics dog through the parking lot of a motel with the permission of the motel manager. The dog alerted to the trunk of the defendant's car. When the defendant approached his car, the border patrol agent asked if he could inspect the car and look in the trunk. The defendant denied the agent's requests and refused to open the trunk. The dog again sniffed the car and alerted to the trunk. At that point, the agent took the keys from the ignition, opened the trunk and found several large bags containing marijuana. The district court granted the defendant's motion to suppress the evidence seized by the agent. The Tenth Circuit reversed, holding that "random and suspicionless dog sniffs are not searches subject to the Fourth Amendment." *Id.* at 1527. The Tenth Circuit explained that the Fourth Amendment does not protect an individual's subjective expectation of privacy where the only information revealed is limited to contraband items, as such an expectation of privacy is not reasonable or justifiable. *See Id.*

Before addressing the issue of whether the dog sniff constituted a search, however, the Tenth Circuit first conducted a separate analysis to determine whether the government agent's entry into the motel parking lot intruded on a legitimate expectation of privacy and thus constituted an independent violation of the Fourth Amendment. The Tenth Circuit noted that a government agent "may not unlawfully enter an area in order to conduct such a dog sniff. The physical entry itself may intrude on a legitimate expectation of privacy." *Id.* at 1527 n.1. Based on the facts before it, the Tenth Circuit concluded that neither the defendant nor the motel owner had a legitimate expectation of privacy in the parking lot, which was open and visible from public roads, did not restrict the public

-11-

from entering and had no fences surrounding it.  Because "[n]either the owner nor a guest could reasonably expect that such a parking lot would be private," the Tenth Circuit held that the agent's entry into the parking lot was not a search.  *Id.* at 1526.

In *United States v. Winningham*, 140 F.3d 1328 (10th Cir. 1998), the Tenth Circuit engaged in the same analysis and came to a different conclusion.  In *Winningham*, agents stopped a van based on reasonable suspicion that it might be carrying undocumented aliens.  The agents asked for permission to search the van and the defendant consented.  An agent opened the van door, looked inside and found nothing.  The agent then asked for consent to run a dog on the van.  The dog, who was not on a leash, leapt into the van and began to sniff the interior, eventually alerting to a rear vent.  The Tenth Circuit concluded that the agents violated the defendant's Fourth Amendment rights by facilitating the dog's entry into the van.  "It was the dog's intrusion into the defendant's private space, not its sniffing at the open van door, that invalidated the search."  *State v. Cleave*, 131 N.M. 82, 86 (2001), *cert. denied*, 132 N.M. 82 (2002).  Both *Ludwig* and *Winningham* illustrate that the initial "question always to be asked is whether the use of a trained dog intrudes on a legitimate expectation of privacy."  *United States v. Thomas*, 757 F.2d 1359, 1366 (2nd Cir.), *cert. denied sub nom.*, *Fisher v. United States*, 474 U.S. 819 (1985).

In the instant case, before subjecting Defendant's jacket to the dog sniff, Agent Garnsey took the jacket from Defendant's custody in order to arrange exposure to the narcotics dog.  The Court thus must conduct a threshold analysis to determine whether there was a seizure of Defendant's jacket prior to the dog sniff and, if so, whether that seizure intruded on a legitimate expectation of privacy.  If the initial seizure of the jacket intruded on a legitimate expectation of privacy, it was not reasonable within the meaning of the Fourth Amendment.

-12-

A seizure of property is "some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). In *United States v. Place*, 464 U.S. 696 (1983), the Supreme Court considered the reasonableness of the seizure of property for the purpose of conducting a dog sniff.  Specifically, in *Place*, agents had temporarily detained the defendant's personal luggage at the airport for the purpose of exposing it to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contained narcotics. *See Id.* at 697-98.  Although concluding that the dog sniff was not a search, the Supreme Court held that there was "no doubt that the agents made a 'seizure' of [the defendant]'s luggage for purposes of the Fourth Amendment" when they took the luggage from his custody in order to arrange exposure to a narcotics detection dog.  *Id.* at 707.

The general rule is that a seizure of personal property is "*per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."  *Id.* at 701.  Under *Place*, the court is directed to evaluate whether "the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests" and to balance the intrusiveness of the detention against the opposing law enforcement interests.  *Id.* at 703.  Only if the nature and extent of the detention are minimally intrusive and the opposing law enforcement interests are significant, "a seizure [can be] based on less than probable cause."  *Id.*

Under this balancing test, the Supreme Court determined that officers have a "narrow authority . . . to detain briefly luggage reasonably suspected to contain narcotics" so long as the detention does not exceed "the permissible limits of a *Terry*-type investigative stop."  *Id.* at 710, 709. Applying this standard to the facts before it, the Supreme Court found that the agents had exceeded

the permissible limits of an investigative stop because of the extended length of the detention of the defendant's luggage and the failure of the agents to accurately inform the defendant of the place to which they were transporting his luggage, the length of time he might be dispossessed and what arrangements would be made for return of the luggage if the investigation dispelled suspicion. *See Id.* at 710. As a result, the Supreme Court held that the seizure of the defendant's luggage was unreasonable under the Fourth Amendment and that, accordingly, the evidence obtained from the subsequent dog sniff was inadmissible. *See Id.*

In evaluating the reasonableness of a seizure, "*Place* does not give blanket authority to base all seizures on no more than reasonable articulable suspicions; rather, *Place* allows courts to evaluate individual circumstances and decide whether reasonable articulable suspicions are all that is required to justify the seizure at issue." *United States v. Fifty-Three Thousand Eighty-Two Dollars in United States Currency ("$53,082")*, 985 F.2d 245, 249 (6th Cir. 1993). For example, in *$53,082*, the Sixth Circuit determined that reasonable articulable suspicion was not all that was required where agents at an airport seized money from the claimant travelers in order to conduct a dog sniff. In *$53,082*, the agents had stopped the claimants for questioning and, upon the claimants' consent, conducted a search of their bags. While the agents were searching their bags, the claimants told the agents that they were carrying money in their socks, removed the money from their socks and placed it on a table in the airport DEA office. The agents then informed the claimants that the money would be subjected to a dog sniff.

The Sixth Circuit held that a seizure occurred when the agents told the defendants that the money would be subjected to a dog sniff. In determining whether the seizure was reasonable, the Sixth Circuit distinguished the case before it from *Place*, explaining that "[t]he facts of *Place* present a substantially different type of privacy interest than is presently involved. In *Place*, government

-14-

agents seized the defendant's luggage; whereas, in this case, the agents seized cash which claimants carried on their persons.  Luggage is routinely subject to airport scrutiny unlike items carried on one's person." *Id.* at 249.  The Sixth Circuit concluded that, because a greater expectation of privacy exists in items carried on one's person, "[p]robable cause is required to justify the seizure of such items." *Id.*  Accordingly, the Sixth Circuit held that the dog's alert to the money was "the fruit of an illegal seizure and, as such, [had to] be excluded." *Id.* at 250.

Applying *Place* to the instant case, the Court finds that a seizure occurred when Agent Garnsey took Defendant's jacket in order to expose it in a clothing lineup to a narcotics detection dog.  There can be no question that Defendant had a reasonable or justifiable expectation of privacy in his jacket. *See Katz v. United States*, 389 U.S. 347, 351 (1967); *Martinez v. Turner*, 461 F.2d 261, 264 (10th Cir. 1972); *Edmundson v. McCarthy*, Civ. A. No. 90-2481, 1990 WL 201364, **5 (E.D. Penn. Dec. 6, 1990); *Nelson v. City of Chicago*, No. 86 C 0805, 1986 WL 8367, **1 (N.D. Ill. July 23, 1986).  Moreover, as Defendant was wearing his jacket, the seizure involved removing Defendant's jacket from his person.  Unlike *Place*, which involved a dog sniff of the exterior of the defendant's luggage, the seizure here invaded Defendant's bodily integrity.  Case law makes clear that there is a greater expectation of privacy in one's home and in one's bodily integrity.  *See United States v. Garcia*, 42 F.3d 604, 606 (10th Cir. 1994), *cert. denied*, 514 U.S. 1073 (1995); *United States v. Morales-Zamora*, 914 F.2d 200, 205 (10th Cir. 1990).  The seizure of Defendant's jacket which he carried on his person is similar in nature and extent to the seizure of cash which the claimants carried on their person in *$53,082*.  As the Sixth Circuit found in *$53,082*, the seizure of Defendant's jacket is substantially more intrusive than the seizure of the luggage of which the Supreme Court approved in *Place*.   Under the *Place* analysis, reasonable suspicion thus was

insufficient to justify the seizure of Defendant's jacket.  Rather, the seizure required either probable cause or Defendant's consent.

As set forth above, the government admits, and the Court agrees, that the agents had no more than reasonable suspicion at the time Defendant's jacket was seized.  In the absence of Defendant's consent, the seizure of Defendant's jacket thus was in violation of the Fourth Amendment.  The government has "the burden of proving consent and must show by 'clear and positive testimony that consent was unequivocal and specific and freely given . . . without duress or coercion, express or implied.'"  *Winningham*, 140 F.3d at 1331 (citation omitted).  Whether consent is voluntary "is a question of fact to be determined from the totality of the circumstances."  *Id.*  The court may consider, "among other factors, whether the consent request occurs during the suspect's detention, whether the officer fails to inform the suspect he or she was free to leave or refuse consent, whether the person granting consent exhibits discomfort during the search or expresses a desire to halt the search, and whether multiple officers are present."  *Id.* at 1332 (citations omitted).

In the instant case, the government has failed to show by clear and positive testimony that Defendant consented to the seizure of his jacket.  As set forth above, while Agent Garnsey testified at the hearing that he asked Defendant whether he would mind if he put the jacket into a clothing line-up and that Defendant agreed to give him the jacket, Agent Garnsey's written report of the incident nowhere states that Defendant consented to give him the jacket.  Moreover, the government's response papers state that Agent Garnsey does not recall whether Defendant consented to the seizure of his jacket.  None of the other officers at the scene testified that they heard Agent Garnsey ask for Defendant's consent or Defendant grant his consent.  Given the remainder of the evidence before the Court, Agent Garnsey's testimony that Defendant agreed to give him the jacket is not credible.

The Court finds Defendant's testimony both consistent with the remainder of the evidence and credible.  According to Defendant, an officer told him that he needed to have the jacket and then grabbed the jacket from him.  Defendant further testified that he felt that he had better give the jacket to him, so he just let it go and did not fight.  This is insufficient to establish lawful consent to the seizure of his jacket.  *See Martinez v. Turner*, 461 F.2d 261 (10th Cir. 1972) (finding no lawful consent to seizure of coat where officers asked the defendant to bring coat to attend line-up, the defendant repeatedly refused to bring the coat, the officers directed him to do so several times, and the defendant finally said, "If you want the coat take it.")

Moreover, the instant case "demonstrates several of the factors indicative of involuntary consent." *Winningham*, 140 F.3d at 1332.  At the point when Agent Garnsey told Defendant that he needed his jacket, Defendant knew that the agents had taken a specific interest in him and suspected that he was one of the occupants of the truck loaded with marijuana.  Defendant already had been questioned by several officers and testified that he had not felt free to leave since he completed his telephone call to his wife.  Agent Garnsey testified that, when he arrived, there were four officers at the scene.  Further, Agent Garnsey testified that he never told Defendant that he was free to leave and that he did not hear any of the other officers tell Defendant that he was free to leave.  "[G]iven the presence of multiple relevant factors and the totality of the circumstances," Defendant's relinquishment of his jacket cannot be considered voluntary consent to the seizure of his jacket.  *Id.*

As Defendant did not consent to the seizure of his jacket, the seizure was based on reasonable suspicion alone.  As set forth above, reasonable suspicion was an insufficient basis for the seizure of Defendant's jacket.  Accordingly, the seizure of Defendant's jacket violated the Fourth Amendment.  The dog's subsequent alert to Defendant's jacket in the clothing line-up was the fruit of an illegal seizure.  As such, the evidence obtained as a result of the dog sniff must be suppressed.

II.   Probable Cause

The government has the burden to establish probable cause in support of a warrantless arrest.

*See United States v. Mendoza-Ramos*, 12 Fed. Appx. 800 (10th Cir. 2001).  The Tenth Circuit has

explained that:

> [p]robable cause exists where the facts and circumstances within the officers'
> knowledge, and of which they have reasonably trustworthy information, are sufficient
> in themselves to warrant a [person] of reasonable caution in the belief that an offense
> has been or is being committed. . . . [M]ere suspicion is insufficient to establish
> probable cause.

*United States v. Edwards*, 242 F.3d 929, 934 (10th Cir. 2001) (citations omitted).

A.   Probable Cause Based on the Dog Alert to Defendant's Jacket

Even if the seizure of Defendant's jacket for the purpose of subjecting it to a dog sniff had

been proper, the Court finds that the dog alert was insufficient to establish probable cause for either

the subsequent search of Defendant's jacket or Defendant's arrest.  In support of its argument that

the dog alert gave the officers probable cause for the search and the arrest, the government again

relies upon *Ludwig*.  In *Ludwig*, the Tenth Circuit held that the alert of a narcotics dog to the

defendant's car was sufficient to give probable cause for the agents to open and search the

defendant's trunk.  In reaching this holding, the Tenth Circuit rejected the defendant's argument that

dog sniffs are not as reliable as courts assume, stating, "a dog alert usually is at least as reliable as

many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that

there is contraband."  *Ludwig*, 10 F.3d at 1527.

The circumstances of the instant case are distinguishable from *Ludwig* and, in fact, from all

of the dog sniff cases that this Court has reviewed.  *Ludwig* and the other dog sniff cases stand for

the proposition that the alert of a narcotics dog is reliable enough to give probable cause to search

a car, luggage or similar object belonging to a certain suspect for drugs.  Here, the agents already had

located marijuana in the truck and thus did not need to conduct a search to find drugs within a certain vehicle belonging to a certain suspect.  Rather, the agents used the narcotics dog to link Defendant to the truck which contained the drugs.

While a dog alert may be reliable enough to establish probable cause that there are drugs located within a vehicle, the government has not provided, and the Court has not found, any precedent suggesting that a dog alert is reliable enough to establish probable cause to link a certain individual to a vehicle that contains drugs.  Indeed, the testimony of the government's own witnesses suggests to the contrary.  Agent Garnsey testified that the dog alert was not necessarily an association to the truck but only an alert to the odor of marijuana.  Specifically, Agent Garnsey explained that the dog would have alerted so long as there was the odor of marijuana regardless of the source of that odor.  Accordingly, Agent Garnsey admitted, the dog would have alerted whether the odor was a result of a joint in the jacket pocket, the jacket earlier having been in the vicinity of a group of individuals smoking marijuana or Defendant having been in the truck.  Moreover, Agent Garnsey admitted that the dog would not have been able to discern the precise source of the odor.  Thus, Agent Garnsey admitted, the dog alert could have been an association to the truck but it just as likely could have been an association to another source of the odor of marijuana.  This is especially crucial here, as Defendant testified that he had been smoking marijuana.  Deputy Arredondo corroborated Defendant's testimony, stating that Defendant told him he had smoked a joint earlier and stating that he smelled burnt marijuana on Defendant, which smell was consistent with Defendant's admission.  Given the totality of the circumstances, the dog alert created less than a fair probability that Defendant was one of the occupants of the truck.  Accordingly, the Court finds that the dog alert was insufficient to establish probable cause for either the subsequent search of Defendant's jacket or Defendant's arrest.

B.      Probable Cause Based on the Piece of Plastic Found in the Truck

The government argues that the match between Defendant's shoes and the footprint on the piece of plastic found in the truck provided another independent basis to establish probable cause for Defendant's arrest.  Based upon its own independent review of the photographs, the Court finds that there was no match between Defendant's shoes and the piece of plastic.  The piece of plastic appears small in comparison to the area in the truck where it was found and does not appear large enough to contain a footprint at all.  The marks on the plastic do not appear similar to the pattern on the bottom of Defendant's shoes.  The piece of plastic was not connected to the truck in any way, and none of the government's witnesses could explain how, if at all, it had been connected to the truck.  The government's witnesses admitted that no tests were run or measurements taken of the piece of plastic or of Defendant's shoes.  None of the agents removed Defendant's shoes to compare them to the piece of plastic. Indeed, Agent Garnsey did not even know what size shoes Defendant was wearing. Given the totality of the evidence, the Court finds that the piece of plastic provided no evidentiary link between Defendant and the truck, let alone probable cause for Defendant's warrantless arrest.

III.    Inevitable Discovery

The government argues that, even if the Court finds that the search of Defendant's jacket was illegal, the evidence discovered through the search, *i.e.*, the cellular telephone, would have been discovered inevitably and thus need not be suppressed.  The government bases this argument on its assertion that the piece of plastic alone would have provided probable cause for Defendant's arrest and that, following such an arrest, the officers inevitably would have discovered the cellular telephone through a search incident to Defendant's arrest.  As set forth above, however, the Court finds that there was no match between the piece of plastic found in the truck and Defendant's shoes and that the piece of plastic would not have provided probable cause for Defendant's arrest.  The

government's argument that the cellular telephone inevitably would have been discovered thus fails. Accordingly, the evidence discovered through the search of Defendant's jacket must be suppressed.

## **CONCLUSION**

The seizure of Defendant's jacket based on reasonable suspicion alone was in violation of the Fourth Amendment. Accordingly, the narcotics dog's subsequent alert to the jacket in the clothing line-up was the fruit of an illegal seizure. As such, the evidence obtained as a result of the dog sniff, namely the cell phone, the fact that the cell phone fit into the truck and the piece of plastic found in the truck, must be suppressed. Even if the seizure of Defendant's jacket had been lawful, the dog's alert to the jacket was insufficient to establish probable cause either for the subsequent search of Defendant's jacket or for Defendant's arrest. Moreover, because there was no match between the piece of plastic found in the truck and Defendant's shoes, the piece of plastic did not provide probable cause for Defendant's arrest. Accordingly, Defendant's arrest was unlawful and any post-arrest statements must be suppressed.

**IT IS THEREFORE ORDERED** that Defendant Oscar Felix Carrazco-Escalante's Motion to Suppress **[Doc. No. 30]** is hereby **GRANTED**.

Dated this 21st day of January, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorney for Plaintiff:
Alfred Perez

Attorney for Defendant:
James Maus